UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

Jonathon M. DeWald, On Behalf of Himself )
And All Others Similarly Situated,        )
                                          )
                    Plaintiff,            )
                                          )        1:09-cv-00745-SEB-DML
          vs.                             )
                                          )
Zimmer Holdings, Inc., David C. Dvorak,   )
Robert A. Hagemann, Arthur J. Higgins,    )
Cecil B. Pickett, Stuart M. Essig, Augustus )
A. White, Larry C. Glasscock, John L.     )
McGoldrick, Dennis E. Cultice, Renee P.   )
Rogers, James T. Crines, The Benefits     )
Committee, The Administrative Committee,   )
and John Does 1-20,                       )
                                          )
                    Defendants.

**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS**

     This is a class action brought pursuant to § 502 of ERISA, 29 U.S.C. § 1132, on

behalf of participants in the Zimmer Holdings, Inc. Savings and Investment Program (the

"Plan").[1]  The proposed class is comprised of participants in and beneficiaries of the Plan

from October 5, 2007 through September 2, 2008 (the "Class Period.").  We previously

dismissed the securities fraud action against some of the same Defendants based on many

of the same facts.  See Plumbers & Pipefitters Local Union 719 Pension Fund v. Zimmer

_____

[1]Participants in the Zimmer Puerto Rico Savings and Investment Program are also
members of Plaintiff's proposed class.

Holdings, Inc., No. 1:08-cv-01041-SEB-DML, 2011 U.S. Dist. LEXIS 9253 (S.D. Ind. Jan. 28, 2011).

Plaintiff alleges that Defendants were fiduciaries of the Plan and, as such, breached various duties they owed to Plaintiffs, in violation of ERISA. Compl. ¶ 5. Specifically, Plaintiff alleges that: (Count I) Defendants failed to prudently and loyally manage the Plan's investment by continuing to offer Zimmer company stock when it was no longer prudent to do so; (Count II) Defendants failed to provide Plan participants with complete and accurate information regarding Zimmer company stock so as to sufficiently advise those participants of the true risks of investing their savings in that stock; (Count III) those Defendants responsible for the selection, removal, and monitoring of the Plan's fiduciaries failed to do so properly and to replace those whose performance was inadequate; (Count IV) Defendants failed to avoid conflicts of interest and to serve the participants in the Plan with undivided loyalty; (Count V) Defendants breached their duties as co-fiduciaries by being aware of each other's breaches of fiduciary duties and failing to act; and (Count VI) Defendant Zimmer knowingly participated in the aforementioned breaches of fiduciary duties.

Plaintiff seeks to recover losses to the Plan for which Defendants are personally liable, pursuant to ERISA §§ 409 and 502(a)(2), 29 U.S.C. §§ 1109 and 1132(a)(2). In addition, Plaintiff seeks equitable relief, pursuant to ERISA § 502(a)(3). Plaintiff filed his Amended Class Action Complaint on January 23, 2009 [Docket No. 18]. Currently before the Court is Defendants' Motion to Dismiss the Amended Class Acton Complaint

[Docket No. 31].  For the reasons detailed herein, Defendants' motion is GRANTED.[2]

## I. Factual Background

The facts below are taken from the Amended Complaint and for purposes of this motion are accepted as true.  See Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949-50 (2009).

### A. The Parties

Plaintiff Jonathon DeWald is a former Zimmer employee and a participant in the Plan.  Compl. ¶ 19.  He seeks to represent a class of "[a]ll persons who were Participants in or beneficiaries of the Plan at any time between October 5, 2007 through September 2, 2008 . . . and whose accounts held Company stock or units in the Zimmer Stock."  Compl. ¶ 42.

Defendant Zimmer is a global leader in the design, development, manufacture and marketing of reconstructive orthopaedic implants, including joint and dental implants, spinal implants, trauma products, and related orthopaedic surgical products.  Compl. ¶ 20.  The Amended Complaint alleges that Zimmer ultimately had "broad oversight of and . . . decision-making authority respecting the management and administration of the Plan and the Plan's assets, as well as the appointment, removal, and, thus, monitoring of other fiduciaries of the Plan that it appointed, or to whom it assigned fiduciary responsibility."

---

[2]Along with their Motion to Dismiss, Defendants filed various supporting exhibits.  The Court may consider such documents as long as they are referenced in the Amended Complaint, authentic, and central to Plaintiff's claims.  Wright v. Assoc. Ins. Cos., 29 F.3d 1244, 1248 (7th Cir. 1994).  The Court may also take judicial notice of matters in the public record, such as SEC filings, on a motion to dismiss.  We find that the documents proffered by Defendants meet all of these requirements and, thus, we have considered them for purposes of resolving this motion.

Id. ¶ 21.

The Complaint includes as Defendants the following Zimmer directors ("Director Defendants"): Zimmer Chief Executive Officer and President David Dvorak, Robert Hagemann, Arthur Higgins, Cecil Pickett, Stuart Essig, Augustus White, Larry Glasscock, John McGoldrick. Compl. ¶¶ 22-29. Plaintiff alleges that the Director Defendants were fiduciaries of the Plan –

> because [they] exercised discretionary authority or discretionary control with respect to the appointment of Plan fiduciaries and with respect to the management of the plan, [they] possessed discretionary authority or discretionary responsibility in the administration of the Plan, and [they] exercised authority or control with respect to the management of the Plan's assets.

Id.

The Complaint also names the Benefits Committee as a defendant. Compl. ¶¶ 30-31. The Benefits Committee membership is determined by Zimmer's Board of Directors. Id. Zimmer's Summary Plan Description states that the Benefits Committee periodically reviews the Plan's investments and has the discretion to add or subtract from that list of investments. Id. ¶ 34. Furthermore, pursuant to the Restated Zimmer Holdings, Inc. Savings and Investment Program (one of the "Plan Documents"), the Benefits Committee is imbued with the following powers:

> (a) to determine the method and medium of funding benefits under the Plan;
>
> (b) select the trustee of any trust through which the Plan is funded;
>
> (c) be a "named fiduciary" with respect to control or management of the assets of the Plan so as to permit the Benefits Committee to delegate

4

authority to manage, acquire, or dispose of assets of the Plan to one or more Investment Managers as provided in Section 402(c)(3) of ERISA;

(d) determine the extent to which trust assets shall be invested in collective investment vehicles such as pooled real estate funds, venture capital companies, mutual funds, insurance contracts, etc.;

(e) determine the extent to which trust assets shall be invested in stock of Zimmer, an Employing Company or an Affiliate;

(f) establish with any such Investment Manager or trustee such guidelines or restrictions relating to the types of assets in which funds may be invested as the Benefits Committee shall consider appropriate (in which case the Benefits Committee shall have the fiduciary responsibility for ensuring that the diversification requirements of ERISA are not violated by any such guidelines or restrictions);

(g) monitor the performance of all such trustees, Investment Managers and collective investment vehicles;

(h) select the Plan's actuary and monitor the performance of such actuary; and

(i) approve the funding assumptions and methods to be used by the actuary for the Plan (in consultation with such actuary).

Id. ¶ 32. Finally, Section 8.01 of the First Amendment to the Plan provides:

Establishment of Investment Funds. The Benefits Committee shall establish the Zimmer Stock Fund and such other Investment Funds as it shall determine to be necessary or appropriate for the purpose of providing Participants with options for the investment of their Plan accounts and may, from time to time, (i) establish additional Investment Funds, (ii) liquidate (or provide that no new investments be made in), or change permissible investments of existing Investment Funds, or (iii) openan Investment Fund that had previously been closed to new investments by Participants pursuant to Section 8.01(ii) above. There shall also be established a Participant Loan Fund from which all loan proceeds shall be disbursed and to which the outstanding balance of, and accrued interest on, any outstanding loan shall be credited. *Effective December 2, 2009, the Benefits Committee shall liquidate the Zimmer Stock Fund.*

Id. ¶ 35 (emphasis added).

The Complaint also names the Administrative Committee as a Defendant. Compl. ¶ 36. Membership on the Administrative Committee is determined by the Benefits Committee. Pursuant to Zimmer's Summary Plan Document, the Administrative Committee is responsible for the Plan's administration, including "the interpretation of any of the provisions of the Plan, the establishment of procedures and rules governing the operation of the Plan, and the determination of benefits under the Plan." Id. ¶ 37. The Plan Document vests the Administrative Committee with the following authority:

(a) [c]ontrol and manage the operations and administration of the Plan and it shall be deemed the "Administrator" of the Plan as the term "Administrator" is defined in ERISA and shall be, in its capacity as "Administrator" with respect to the Plan a "named fiduciary" as that term is defined in ERISA;

(b) take all actions required to be taken by the "plan administrator" of the Plan under ERISA, including the preparation and filing of all reports and other materials required to be filed with governmental agencies under ERISA, and the preparation and distribution of all required notices, reports, plan summaries, election forms, etc., to Participants and their Beneficiaries;

(c) be responsible for construing and interpreting the provisions of the Plan; and resolving any ambiguities therein, and for maintaining a claim procedure under the Plan as required by ERISA;

(d) establish rules for operations of the Plan to the extent required by the terms thereof or deemed appropriate by the Administrative Committee;
(e) make any discretionary administration decisions required to be made under the terms of the Plan;

(f) adopt written procedures pursuant to which the Administrative Committee shall operate;

(g) authorize benefit payments under the Plan when due;

(h) assume such additional or different responsibilities as the Benefits Committee shall allocate to the Administrative Committee in accordance with the authority granted to the Benefits Committee; and

(i) report at least annually (or more frequently, if the Benefits Committee shall so request) to the Benefits Committee concerning the operation of the Plan, which report shall include a compliance summary.

Id. ¶ 38.

Defendant Renee Rogers, Vice President of Global Resources, served as signatory to the Plan Document, the First Amendment to the Plan Document, and the Plan Investment Policy Statement. Id. ¶ 39. She was also a signatory to Form 11-K for the Plan for 2007. Id. Defendant James Crines, Executive Vice President of Finance and Chief Financial Officer, also signed the Plan Document. Id. ¶ 40. The Complaint alleges that, like the Defendant Directors, these individual Defendants were also fiduciaries of the Plan because "they exercised discretionary authority or discretionary control with respect to the appointment of Plan fiduciaries and with respect to the management of the Plan . . . possessed discretionary authority or discretionary responsibility in the administration of the Plan, and . . . exercised authority or control with respect to the management of the Plan's assets." Id. ¶¶ 39-40.

Finally, Plaintiffs have sued John Does 1-20, all individuals who allegedly "are or were fiduciaries of the Plan during the Class Period." Id. ¶ 41. Although their identities are currently unknown to Plaintiff, he has indicated that he will seek to join them as named defendants once their identities are ascertained. Id.

**B.     The Plan**

The Plan is sponsored by Zimmer Holdings, Inc.  Compl. ¶ 60.  It is a "defined contribution" or "individual account" plan as defined in ERISA § 3(34), 29 U.S.C. § 1002(34), because it provides individual accounts and benefits for each participant based solely upon the amount contributed plus any income, expenses, gains, losses, and forfeitures which may be allocated to that account.  Compl. ¶ 52.  Such plans are generally referred to as eligible individual accounts or "EIAPs."  The Plan was established in 2001 in conjunction with Zimmer's spin-off from Bristol-Myers Squibb Company.  Id. ¶ 58.  The Plan was restated completely on January 1, 2007 and was further amended on September 2, 2008.  Id.  The Plan's purpose is to allow participants to save funds for their futures.  Id.

The assets of the Plan are held and managed by its trustee, Fidelity Management Trust Company.  Id. ¶ 53.  The Plan is invested in Zimmer common stocks (the "Zimmer Stock Fund"), mutual funds, common/collective funds, cash and cash equivalents and participant loans.  Id. ¶ 53.

According to the Summary Plan Document, the Plan is "intended to meet the requirements of Section 404(c) of [ERISA] and Title 29 of the Code of Federal Regulations Section 2550.404c-1.[3]  Summary Plan Doc. at 17.  The Summary Plan

---

[3]Section 404(c) provides a safe harbor from liability for fiduciaries of self-directed accounts that provides as follows:

(c) Control over assets by participant or beneficiary

(1)(A) In the case of a pension plan which provides for individual accounts and
(continued...)

Document explained: "With a Section 404(c), the participants and beneficiaries of the Program bear responsibility for their investment decisions. The people responsible for administering the Program and managing the investments, the 'plan's fiduciaries,' are relieved of liability for any losses resulting from investment decisions made by participants and beneficiaries." Id.

The Zimmer Stock Fund is one of twenty-eight investment options available to Plan participants. Pl.'s Mem. at 4. The Summary Plan Document includes a separate section entitled "Additional Information about the Zimmer Holdings, Inc. Stock Fund," which explains the non-diversified nature of the fund and states that "the principal of the fund is not guaranteed and would normally fluctuate more than that of a diversified fund." Summary Plan Doc. at 14. It further provides that an individual who might want to invest in the Zimmer Stock Funds would be someone who "wants to own part of the company

---

[3](...continued)
permits a participant or beneficiary to exercise control over the assets in his account, if a participant or beneficiary exercises control over the assets in his account (as determined under regulations of the Secretary)—

(i) such participant or beneficiary shall not be deemed to be a fiduciary by reason of such exercise, and

(ii) no person who is otherwise a fiduciary shall be liable under this part for any loss, or by reason of any breach, which results from such participant's or beneficiary's exercise of control, except that this clause shall not apply in connection with such participant or beneficiary for any blackout period during which the ability of such participant or beneficiary to direct the investment of the assets in his or her account is suspended by a plan sponsor or fiduciary.

29 U.S.C. § 1104(c).

they work for and share in the gains and losses of its stock" and "whose investment portfolio can withstand the higher risk of investment in a single stock." <u>Id.</u> at 15. Finally, the Summary Plan Document includes a table showing the high, low, and closing per share sale prices of Zimmer stock for several periods. <u>Id.</u> The range of variability from high to low stock prices per quarter reflected a low of $5.14 and a high of $15.47. <u>Id.</u>

The First Amendment to the Plan Document specifically provides for the establishment of the Zimmer Stock Fund option but does not require that that Fund remain an investment option to Plan participants.[4] New contributions into that Fund were disallowed as of September 2, 2008, and the Zimmer stock was removed entirely as an investment option as of December 2, 2009. Am. Compl. ¶¶ 35, 55.

### C. Events Leading Up to This Lawsuit

The gravamen of Plaintiff's Complaint is that Defendants continued to allow participants of the Plan to invest in Zimmer stock when it was no longer prudent to do so. Although the factual background of the events leading up to this lawsuit are summarized below primarily in chronological fashion, we note here at the outset that Plaintiff has focused his claims on two areas of ongoing trouble for the company, which he alleges should have caused Defendants to question the prudence of that continued investment, to wit, quality problems the Company experienced relating to the manufacturing of its

---

[4]Defendants dispute this allegation, maintaining that, by its terms, the Plan required that the Zimmer Stock be offered as an investment option to participants. Def.'s Mem. at 24. However, viewing Plaintiff's allegations in the light most favorable to him, as we must, we assume for present purposes only that offering this investment option was not required.

10

orthopaedic surgical products ("OSPs") and safety concerns relating to the company's Durom Femoral Component Durom hip resurfacing system, referred to by the parties as the "Durom Cup."

Beginning on October 5, 2007, Zimmer began to receive complaints from distributors regarding persons injured and requiring hospitalization as a result of defects relating to the Durom Cup. Compl. ¶ 73. Additional notices from distributors indicating similar occurrences were received on November 23, 2007, January 8, 2008, January 15, 2008, February 7, 2008, and February 12, 2008. Compl. ¶¶ 74-77, 86-87.

On January 29, 2008, Zimmer issued a press release announcing its financial results for the fourth quarter of 2007 and for the full fiscal year. Id. ¶ 78. This release was also filed with the SEC on the company's Form 8-K. As set forth in the release, Defendant Dvorak stated: "We are pleased with our overall results for the fourth quarter, especially the strength of our sales across our geographic segments . . . . Our business units around the world responded to strong underlying growth in procedures during the quarter." Id. ¶ 78. A conference call occurred later that day, during which Defendant Dvorak stated:

> Turning to our 2008 outlook. We developed our 2008 guidance taking into account our assessment of the market and the opportunities and risks that could impact our performance. I'll now take you through our expectations for our sales and earnings. First, looking at the market for our core reconstructive product categories and geographies, we enter 2008 with positive momentum and underlying market demand for orthopedic devices. When all Company reports are in for 2007, we expect the results will indicate that the global reconstructive market grew in the range of 8 to 10%. We continue to believe this reflects mid single digit growth and procedures with the balance due to

> mix and flat to modest price improvements. We anticipate similar market dynamics in 2008 and slightly higher market growth rates for spine, trauma, dental, and extremities consistent with recent trends. Our outlook calls for top line growth for the year of 10 to 11% net sales on a reported basis and adjusted earnings per share of $4.20 to $4.25. Sales will be driven by new product introductions and further market penetration by key products launched in 2007, as well as the positive effect of a weaker U.S. dollar abroad. We attribute approximately 2 points of sales growth in our range to the impact of foreign currency exchange rates.

Id. ¶ 79. Dvorak clarified that the goals mentioned above reflected what the company expected to meet or exceed, as opposed to statements representing the company's "aspirational" goals. Id. ¶ 80. Dvorak denied that the company had received any warning letters from the FDA. Id. ¶ 82. The day following these statements the company's stock increased from $68.08 to $77.03, a 13% increase. Id. ¶ 83.

On January 30, 2008, Defendant Crines delivered a presentation on Zimmer's behalf at the Wachovia Healthcare Conference, stating as follows:

> [S]ummarizing our guidance for 2008, we guided to top line of 10% to 11% reported growth. That does include about 200 basis points from currency, so it would translate into 8% to 9% constant currency growth and adjusted earnings per share of $4.20 to $4.25. That reflects about a 4% to 5% growth in adjusted earnings per share over 2007 and includes significant obviously incremental expenses associated with the infrastructure and operating initiatives, as well as monitor and related compliance expenses.
>
> * * *
>
> Within our core franchise, we would expect to be able to achieve at least low double digit growth in earnings going into '09 and have the opportunity to leverage some of these investments beyond 2009.

Id. ¶ 84.

On March 18, 2008, Defendant Crines issued the following statement in his

capacity as Zimmer's representative at the Cowen and Company Health Care Conference:

> We also, as we look at our hip portfolio, recognize and would acknowledge
> that we have some challenges and opportunities . . . . So there are some things
> that we need to do in terms of providing training to orthopedic surgeons and
> some things that we can do, as well, from a development perspective, to
> address some design differences with respect to our device and how it matches
> up with competitive devices. That's something that will take a bit longer. But
> certainly, the training is something that we can begin to address already in
> 2008.
>
> * * *
>
> We have, as we talked about on our fourth quarter call three, major priorities
> for 2008, the first of which is to meet or exceed our financial commitments for
> this year.

Id. ¶ 89.

On April 3, 2008, Zimmer issued a press release (and filed it with the SEC with the

company's Form 8-K), which stated the following:

> Zimmer Holdings, Inc. announced today that it has taken a number of actions
> to improve quality systems at its Dover, Ohio facility, which manufactures
> Zimmer Orthopaedic Surgical Products (OSP).
>
> The Company recently conducted a review of quality systems at the Dover,
> Ohio OSP facility and initiated voluntary product recalls of certain OSP
> products manufactured at the Dover facility that the Company has determined
> do not meet internal quality standards. In addition, the Company has
> voluntarily and temporarily suspended production and sales of certain OSP
> products manufactured at the Dover facility. The suspension will permit the
> Company to focus the OSP organization on the needed improvements to
> manufacturing and conduct enhanced quality training for employees.
> The Company has notified the U.S. Food and Drug Administration (FDA),
> distributors and end-users of the recalls. These recalls do not affect the
> Company's core hip and knee implants business.

13

The OSP division produces a variety of patient care items used to support orthopaedic surgery, including disposables used in blood management, surgical wound site debridement and cement accessories. In 2007, Zimmer reported revenues from its OSP and Other product category of $234 million, less than half of which were generated by products affected by the recalls and suspension. These actions are expected to adversely impact 2008 OSP revenues by $70 to $80 million. Additional detail on the expected impact will be provided during the Company's first quarter investor conference call on April 24, 2008.

Id. ¶ 91.

In early 2008, Dr. Lawrence Dorr, a renowned orthopaedic surgeon and consultant for Zimmer, informed Zimmer of problems he was encountering related to Zimmer's Durom Cup. Specifically, he reported that x-rays of his patients revealed that the Durom Cup was rubbing against bones within the patients' hip sockets, causing them intense pain. Id. ¶ 87. Plaintiff alleges that Zimmer ignored Dr. Dorr's complaints and, instead, blamed these patients' experiences on Dr. Dorr's surgical technique. Id. ¶ 88.

On April 22, 2008, following Zimmer's lack of response to his complaints, Dr. Dorr sent a memo to the American Association of Hip and Knee Surgeons stating as follows:

This NOTICE is to inform you that we have had ten revisions in 165 hips and have four more that need to be revised using the Durom cup (Zimmer, Inc). This failure rate has occurred within the first two years. In the first year the x-rays looked perfect. We have revised four that did not have any radiolucent lines or migration (and John Moreland revised one). These early cups fooled us, but the symptoms were so classic for a loose implant that we operated the patients. When we hit on the edge of the cup it would just pop free. As time goes by the cups begin developing radiolucent lines. We now have one cup at two years that has actually migrated a short distance. It has tilted into varus. We do not believe the fixation surface is good on these

cups. Also there is a circular cutting surface on the periphery of the cup that we believe prevents the cup from fully seating. We stopped using the cup after the first revisions.

We have notified Zimmer. The FDA has been notified and we will notify them of our continued revisions. The company does not believe it should pull the cup from the market so I am notifying all of my colleagues of our failure rate with this cup. I went through a similar scenario with the Sulzer cup failures where I was the only one experiencing revisions at the beginning and basically it was assumed that it was our technique. I can assure you that this goes beyond technique. I learned my lesson in not informing everyone about this magnitude of failures with the Sulzer cup problem, so it is my obligation to do so with this cup.

Compl. ¶ 93. After issuing this memorandum, Dr. Dorr received responses from other doctors who reported problems similar to the ones he had noted.

On April 24, 2008, Zimmer issued a press release (which was again filed with the SEC in the company's Form 8-K) wherein Defendant Dvorak stated:

We are pleased with our earnings performance and cash flow generation in the first quarter . . . . Sales results reflect continued growth in our reconstructive business and we expect to achieve higher levels of penetration with new products as the year progresses. For instance, we are well positioned to move forward with our new knee offerings that are coming on line, including the Zimmer® NexGen® LPS-Flex Mobile Knee, the Gender Solutions™ Natural-Knee® Flex and the Gender Solutions™ Patello-femoral Joint System. In addition, our Kinectiv™ Technology for hip replacement, as well as our Fitmore™ Hip stem, which received FDA clearance for marketing in early March, are creative and innovative additions to our portfolio.

Compl. ¶ 96. The company also held a conference call on that day during which Defendant Dvorak stated:

We previously explained that we developed our guidance taking into account our assessment of the market and the ongoing opportunities and risks that could cause and impact our performance. Our outlook called for top line

growth for the year of 10 to 11% net sales on a reported basis. As we indicated in our fourth quarter call, sales will be driven by new product introductions and further market penetration by key products launched in 2007 and this year, as well as the positive effect of a weaker U.S. dollar abroad. Our guidance for top line growth remains in the 10 to 11% range on a reported basis. The previously announced impact on OSP revenues is expected to be offset by the positive effect of a weaker dollar. In addition, as the year began, we projected earnings per share between $4.20 and $4.25 based on those expectations. We've maintained that guidance today, after taking into account the negative financial impact we'll experience as a result of lost sales, inventory losses, and remediation costs in our OSP business. We have also now factored in the anticipated positive financial impact of a number of other planned actions that that Jim will describe in your detail which are expected to offer the negative impact of the OSP situation.

On our fourth quarter earnings call, Jim and I previewed a number of significant infrastructure initiatives that will position us to respond to the growing medical needs of an aging population. Chief among these are the investments we're making to ensure that we maintain state-of-the-art quality systems and processes in all of our business operations globally. Our ongoing commitment to quality will be unyielding as we continuously improve our quality systems.

To that end, our infrastructure investment plans for 2008 are in part directed at opportunities to enhance quality systems across our entire manufacturing network and to ensure the quality systems and practices in all divisions meet or exceed our standards as well as those of agencies that regulate us. As a result of this endeavor, in the first quarter we initiated a comprehensive remediation effort at our OSP division in Dover, Ohio, including voluntary product recalls of certain OSP products, voluntary and temporary suspension of manufacturing and sales of certain products, facilities equipment and procedural upgrades, enhanced quality training for OSP employees, and appointment of a new Divisional President. While we're clearly disappointed by the OSP situation, we believe the actions we've taken demonstrate the seriousness with which we take quality systems matters and we're keeping the FDA informed of all of our actions.

Compl. ¶ 98. Following these statements, Zimmer's stock price declined from $75.95 to

$72.87, a 4% drop. Id. ¶ 100.

On May 6, 2008, Zimmer made a presentation at Deutsche Bank Securities, Inc., during which Defendant Crines engaged in the following colloquy with analysts (as quoted from Plaintiff's Amended Complaint):

> We have talked in the past about a segment – subsegment of the hip portfolio growing at a faster rate than the overall hip portfolio, that subsegment being the alternate bearing offerings that address the needs of a younger patient, where there's an expectation with, for example, the metal-on-metal offerings, that surgeons will be able to achieve better longevity with those devices. In our particular case, we have this Durom cup, which goes with out Metasul large diameter heads. That is our metal-on-metal offering here in the U.S.

* * *

> I will tell you that this device, this construct, has been in the market here in the U.S. since the second half of 2006. There are many surgeons that have had very good clinical results with this device. It's been in the European market for over three and a half years. There's independent registry data – as an example, the Swedish registry that's tracking over 200 patients and out three and a half years is reporting 99.5% survivorship with this device . . . . I will also tell you that we did receive . . . indications in the European market in the early part of 2007 with a couple of surgeons in France. We were able to trace their experiences to issues with the technique that they were using. This is a cup that once it's seated up into the acetabulum cannot be repositioned.  And we have had situations where – this particular situation in France where a couple of surgeons had experienced early failures as a result of the technique that they were using where they were repositioning the cup after it had been seated up into the acetabulum. So we were able to address that particular issue with surgical technique training. That's an issue I can tell you that we paid a lot of attention to here in the U.S. as this product has been launched into the U.S. There's a lot of information that's provided to our sales reps, training that's provided to our sales reps, so they're able to convey to any surgeons that are using this device the importance of following the technique.

* * *

Tao Levy – Deutsche Bank Securities – Analyst, Moderator:

17

But as far as Zimmer is concerned, I mean, in terms of the product properly manufactured, working well with the proper technique, data out of Europe and out of Australian registries, no reason to pull this thing off the market. It's still a very good product.

Jim Crines – Zimmer Holdings, Inc. – CFO:

We have no plans at this stage to recall this product.

Tao Levy – Deutsche Bank Securities – Analyst, Moderator:

Okay. Any questions from the audience? So I'll move on. OSP, it's another topic of conversation. Obviously last week there was some commentary among investors of the theoretical possibility that that facility would get a warning letter. So maybe you could walk us through the timeline of events, and does – obviously a warning letter can happen at any manufacturing facility, by definition, but where you stand regarding those thoughts.

Jim Crines – Zimmer Holdings, Inc. – CFO:

Sure. I had at an earlier conference responded to questions concerning whether or not that's a possibility, and as you point out that's always a possibility following an inspection. There was an inspection at this facility in the first quarter. There were observations that were made as a result of that inspection. So, again, is there a possibility that that could lead to a warning letter? Yes. That possibility does exist. I want to be very careful to stay away from speculating as to what the FDA will do. The FDA has their own processes, I'm sure, that they go through. And I have no way of knowing, or no insight as to whether or not they would go forward in this particular case and issue a warning letter. At this point we do not have a warning letter.

Tao Levy – Deutsche Bank Securities – Analyst, Moderator:

But it's fair to assume, so they went in, I think it was January time frame, did their inspection, since you recalled products, that you probably got some 483s after they left. Again, I'm assuming that. My understanding of how a warning letter develops is there's some back and forth over time. FDA poses some issues that they've found. Zimmer tries to address them or indicate how they're going to address them. And then FDA comes back

saying whether they're comfortable with that or not, and if not then maybe you get a warning letter down the road.

<u>Jim Crines – Zimmer Holdings, Inc. – CFO</u>:

Well, I'll just walk -- I'll walk through the timeline of events at the Dover facility.  There was an inspection, as I said, in the first quarter.  There were observations made.  The Company, following that inspection and the observations that were made, made a decision internally to pull together a team and send a team into that facility to do our own more in-depth review.  The FDA inspection, I will tell you, is really focused on quality systems.  Our more in depth review covered not just the quality systems but all manufacturing processes, really doing a deep dive on the operation. And we did that, again, coming out of the observations that were made by the FDA inspector, which caused us some concern.

That ultimately led to some additional product recalls and the decision, then, ltimately, to voluntarily suspend production of certain – sales and production of certain products there.  We have, you can assume, both responded to the FDA in terms of what our action plans are concerning the observations that they've made, and then have also provided information to the FDA concerning the additional product recalls, the issues that led us to make those decisions and what our plans – what our broader plans are with respect to addressing all of the issues at that facility, not just the issues that the FDA identified as part of their inspections, but other issues, as well, that we identified as part of our internal review.

<u>Tao Levy – Deutsche Bank Securities – Analyst, Moderator</u>:

You had mentioned that FDA initially went in there to look at quality.

<u>Jim Crines – Zimmer Holdings, Inc. – CFO</u>:

That particular inspection happened to be focused on quality systems.  It was a routine inspection, to my understanding.  They – as a matter of routine, the FDA is in all of these facilities periodically.

* * *

<u>Unidentified Audience Member</u>:

Do you think you could help us with the Durom issue?  I mean, looking at past product issues at other companies, how are these things usually handled over time?  How do they play out?  What happens in terms of products, in terms of surgeon training, in terms of your liability for medical costs for these revision surgeries, if any, etc.?  How does that work?

Jim Crines – Zimmer Holdings, Inc. – CFO:

You know, this Company has a long history, as the industry does, in dealing with failures.  They do happen.  They happen in the normal course.  They are typically multifactorial.  It could be an issue with surgical technique.  It could be an issue with a patient going off and doing things that they're told not to do after getting a total hip or total knee replacement.  As we get information about failures submitted to the Company, we have an obligation to report those to the FDA on a medical device report, an MDR report, so those all get submitted to the FDA.  The surgeons also have an obligation to submit those to the FDA, so as they experience failures within some segment of their patient population they would be submitting.  So there's a fair amount of information in that FDA database – gives you some sense of what the historical sort of failure rate is for these devices.  You know, we talk about 98 to 99% survivorship, which is somewhat unprecedented among medical devices, but that does tell you that there's at least a 2% failure rate.

In terms of how we deal with what arises in the form of product liability claims associated with those failures, we get them.  We have people internally who manage those product liability claims.  I will tell you we're self-insured for those claims.  And at any point in time we are managing a portfolio of product liability claims and either settling out of those claims with cash payments to individuals to cover their cost of their revisions and maybe some payment for pain and suffering.  And that is very common and has been, and I imagine very common across the industry.

Compl. ¶ 101.

In late May 2008, Zimmer informed at least some orthopedic surgeons that it was investigating the complaints lodged by Dr. Dorr.  Id. ¶ 103.  Participants in the Plan, however, were not made aware of this investigation.  Zimmer's investigation ultimately

revealed a failure rate as high as 5.7% at some clinics.[5]  Id.  Meanwhile, doctors around

the country continued to implant approximately 1,300 additional Durom Cups throughout

the time period of this investigation.  Id.

On July 22, 2008, Zimmer issued a press release reporting its financial results for

the second quarter of 2008.  Id. ¶ 105.  Again, a copy of this release was filed with the

SEC as part of the company's Form 8-K.  Id.  Therein, Defendant Dvorak stated:

> Zimmer is temporarily suspending marketing and distribution of the
> Durom® Acetabular Component (Durom Cup) in the U.S. on a voluntary
> basis, while the Company updates labeling to provide more detailed
> surgical technique instructions to surgeons and implements its surgical
> training program in the U.S. The Durom Cup will continue to be marketed
> without interruption outside the U.S.
>
> While many surgeons have had success implanting the Durom Cup since it
> was launched in the U.S. in 2006, a subset have reported cup loosenings and
> revisions of the acetabular component used in total hip replacement
> procedures.  These results contrast with product experience in Europe,
> where post-marketing data continue to show excellent clinical outcomes
> since the product launched in 2003.  Following a comprehensive review of
> clinical experience and product conformance to specifications in the U.S.
> and Europe, Zimmer has found no evidence of a defect in the materials,
> manufacture, or design of the implant.  The Company has identified that
> surgeons who regularly achieve the desired outcome with the Durom Cup
> consistently execute crucial technique steps and place the cup in a specific
> manner.  Following its review, Zimmer has determined that revised surgical
> technique instructions and a surgical training program are required to more
> consistently achieve desired clinical results in the U.S.  The Company has
> shared its review and conclusions with the U.S. Food and Drug
> Administration and will continue to update the Agency.

---

[5]Dr. Dorr later published an article, *Clinical Profile of Patient with a Loose Durom Cup*,
reporting that patients with failed Durom Cup replacements were often in no better position than
they had been prior to the hip replacement surgery.  Compl. ¶ 104.

* * *

The Company is revising its guidance and expects full-year 2008 sales growth to be in a range of 8.5% to 9.0% over the prior year, which reflects constant currency growth of 4.5% to 5.0%. This compares with prior guidance of 10% to 11% reported and 6% to 7% constant currency growth over prior year. The adjustment to sales guidance includes a projected loss of $20 to $30 million in hip product sales pertaining to the Durom Cup in the U.S., weakness in U.S. Dental revenues and slower than anticipated uptake on certain new products. Adjusted diluted earnings per share for the full year are expected to be in a range of $4.05 to $4.10, as compared to prior guidance of $4.20 to $4.25. Revised earnings guidance gives effect to the reduction in sales from prior guidance as well as an increase in operating expenses associated with the global implementation of the Company's enhanced compliance program. Further details regarding the revised guidance will be discussed during tomorrow's investor conference call.

Compl. ¶ 105. Also, on that same day, Zimmer held a conference call with financial analysts, during which the following statements were made (as quoted from Plaintiff's Amended Complaint):

As we communicated last night, we have completed an extensive investigation into the performance of the Durom Cup here in the United States, following reports of cup loosenings and revisions of acetabular component in some patients who have undergone total hip replacement.

While many US surgeons have had success with the Durom Cup since its launch, a subset have experienced elevated revision rates. This observation clearly contrasts ongoing positive clinical experience in Europe, where the product has been available since 2003.

We launched a rigorous investigation, which included a thorough review of manufacturing processes, design specifications, production documentation and clinical experience in the US and Europe. Based on the results of that investigation we will temporarily suspend marketing and distribution of the Durom Cup in the US.

We will update labeling to provide more detailed surgical technique

22

instructions to surgeons and prepare to implement a comprehensive surgical technique training program for the US.

We have reviewed our investigation and conclusions with the US Food and Drug Administration, and are actively communicating with surgeons now through multiple channels to explain this field action and identity and address their related needs.

We're also communicating with customers around the world to clarify that the Durom Cup will continue to be marketed and distributed outside the United States without interruption.

Our primary objective in taking prompt action based on the results of our Durom investigation is to ensure better clinical outcomes for patients. We believe that the likelihood of currently implanted patients requiring revisions is low.

But we want to make sure that we are clear with our US surgeons that they should stop implanting the Durom Cup until we issue the updated labeling that provides more detailed guidance on surgical technique, and until they receive training.

We also, of course, want to make sure we support surgeons in every way we can as we implement these actions. With this goal in mind, we will provide clinical management guidelines to assist surgeons in the ongoing evaluation of patients currently implanted with the Durom Cup. Within the next several weeks we will issue a further communication to US surgeons that provides them with updated labeling, including more detailed surgical technique instructions.

We also are working with experts in Europe and the United States to develop a robust surgical skills training curriculum. Following initiation of the new training program, the Durom Cup will be made available to US surgeons again as they complete training.

We're confident that these measures are the prudent and responsible course of action. And we are committed to conducting them in a manner that demonstrates our deep commitment to patients and our customers.

* * *

We made good progress during the quarter on our quality systems upgrades. With respect to our orthopedic surgical products operation in Dover, Ohio, our remediation plans continue as scheduled. And we expect to have most, if not all, of OSP products back in production by the end of this year, many in the next two or three months.

* * *

During the quarter Jim, Cheryl and I, as well as many other members of our senior management team, personally met with over 100 surgeons. We explained the chronology of events of the past year or so, where we are today, and how we believe our surgeon relationships will carry forward. While this process certainly has not been easy, and we have addressed many tough and fair questions, I will tell you that it is great to be reengaged with our surgeon community.

* * *

I will now turn to our updated guidance for the full year 2008. Jim will provide more details momentarily. Due to the developments in the second quarter, including Durom, we are revising our expectations for 2008 fully full year sales growth to 4.5% to 5% constant currency. We're also lowering our adjusted earnings guidance for the full year to be between $4.05 and $4.10 per fully diluted share.

* * *

Sales of $1,080 million for the quarter represent an increase of 11.2% reported and 5.5% constant currency. These results, among other things, reflect the benefit of one additional selling day in the quarter compared to same period in the prior year, strong underlying unit growth in knees in all three of our operating segments, and lower OSP, Durom and dental product sales.

* * *

In the US Durom Cup sales volume was off 26% from our first quarter in response to reports of loosenings and revisions. Durom Cup sales units outside the US grew by over 10% in the second quarter compared to same period prior year. These results, absent Durom-related losses, reflect steady growth across our primary hip portfolio, including porous primary stems

and our Trilogy and TM Acetabular Cups.

\* \* \*

The OSP and other category was down 15.6% in the Americas, declined 26.8% in Europe, and was down 17.3% in Asia-Pacific compared with the prior year period.

\* \* \*

Now I would like to provide an update on guidance for 2008. We expect to deliver top line sales growth in 2008 of 8.5% to 9% compared to the original 10% to 11% range.  And adjusted earnings per share in the range of $4.05 to $4.10.  Our sales guidance anticipates approximately 4 points of growth to come from foreign currency, and therefore assumes a constant currency growth rate of 4.5% to 5%.  The adjustment to our sales guidance includes a projected loss of $20 million to $30 million in hip products sales, pertaining principally to Durom Cup in the US, weakness in US Dental revenues, and slower than anticipated uptake on certain new products, partly due to delays in offering training programs in support of the new products introductions.

The following colloquy also occurred:

Tao Levy – Deutsche Bank – Analyst:

I was wondering maybe if you could spend a few minutes going through – you did mention as we move into 2009 some of the headwinds you are facing in '08 start to disappear.  I was wondering if you could quantify the three main areas and the impact that you're seeing this year, and what percentage of that could disappear in '09?  I would love it if you could hit Durom, OSP and the compliance monitors.

Jim Crines – Zimmer Holdings, Inc. – EVP Finance, CFO:

This is Jim.  First of all, with respect to – I guess will start with OSP.  As David indicated and I indicated in my comments, we're on schedule with our remediation efforts.  Expect to be back in production of those patient care products between now and the end of the year.  And have the opportunity to go back into the market as those products come back online. Going into 2009 we would look to get back as much of that $70 million to

$80 million as we lost as we possibly can.  We wouldn't expect to get all back.  But we will certainly be back in the market with those products and pursuing opportunities to regain share in that segment.

* * *

Bruce Nudell – UBS – Analyst:

I have two questions actually.  The first just pertains to Durom itself.  In your background you mentioned 1.1% failure rate for people who knew what they were doing and around 6% for groups that really weren't following the protocol exactly.  What is the aggregate – what is the anticipated aggregate revision rate, early revision rate with the product, given the disparities in training? And how much reputational damage could do that cause, given the 13,000 implants that have taken place to date?

David Dvorak – Zimmer Holdings, Inc. – President, CEO:

I'm going to let Cheryl respond to that question.

Cheryl Blanchard – Zimmer Holdings, Inc. – Chief Scientific Officer:

I think the best way to answer that question is, first of all, to understand that what our analysis tells us to date is that the likelihood of currently implanted patients requiring revision is going to be low.  I will tell you that in our detailed analysis of the clinical aspects of those investigations, you did see in the backgrounder piece that in the group that had success with the device that they had about a 1.1% revision rate, while the other groups were at 5.7%.  It is very difficult for us to project out where we think those numbers are going to go eventually.  What I can tell you is that we were able to discern the there were some specific elements of surgical technique and cup placement that are the items that really make the difference in terms of those clinical outcomes.  I think it is difficult to comment on the last part of your question, which is reputational damage.  I think that will frankly be determined by the actions that we have taken today and our level of being proactive as we move forward, trying to work with surgeons to help them get through this difficult situation with their patients.  We absolutely recognize that for those patients that are involved that there will be some items that we will need to help them with, and we're going to be proactive about that.

* * *

Michael Jungling – Merrill Lynch – Analyst:

* * *

Secondly on Durom, the $20 million to $30 million worth of sales, can you indicate how much that is in terms of annual sales?  I think it is pretty much the entire amount.

* * *

Jim Crines – Zimmer Holdings, Inc. – EVP Finance, CFO:

This is Jim.  With regard to Durom, as we indicated in earlier comments, it represents about 5% to 10% of our hip revenues in the US.  It happens to be the case as well outside the US.  If you look at how, and we look at how that product was growing coming into the year, coming out of the first quarter before reports of loosenings and revisions, we were trending clearly to the high end of that range.  And the $20 million to $30 million, again principally associated with Durom, does get you to two-thirds to the full amount.  But as I indicated, with regard to the hip franchise there's also the impact that some disruption that training is having on the new products that we reintroduced in the hip portfolio, namely the M/L taper with Kinectiv and the Fitmore and the EPOCH devices, that we're focused on in the second half of year as well.

* * *

Ben Andrew – William Blair – Analyst:

I just wanted to follow up with a couple of quick things. Is there any plan to accumulate clinical data related to Durom in the United States? You talked about the need for clinical evidence, maybe with a registry or a broader study?

Cheryl Blanchard – Zimmer Holdings, Inc. – Chief Scientific Officer:

What I can tell you is with respect to the ongoing experience and the experience that we will move forward with post training, that we will be continuing to very closely monitor the clinical experience with this device.

Id. ¶ 107.

Following these announcements, Zimmer's stock price declined from $70.88 to $66.01, a 7% drop, over the course of a single day.  Id. ¶ 109.

On August 5, 2008, Zimmer issued a statement in its Form 10-Q for the second quarter of 2008, excerpts of which follow:

> The temporary suspension of marketing and distribution of the Durom Cup in the U.S. will negatively impact hip sales growth for the remainder of 2008.  Additionally, with the lack of a hip resurfacing product within our U.S. hip portfolio, we expect to face a challenge in hip sales growth . . . .
>
> * * *
>
> Gross profit as a percentage of net sales was 75.7 percent in the three month period ended June 30, 2008, compared to 77.7 percent in the same 2007 period and 76.0 percent in the three month period ended March 31, 2008. The primary contributors to the decrease in gross profit margin were the increase in period over period hedge losses, idle plant costs due to the OSP related actions and an increase in excess inventory and obsolescence charges.
>
> * * *
>
> In July 2008, we temporarily suspended the marketing and distribution of our Durom Acetabular Component (Durom Cup) in the U.S. on a voluntary basis. As a result of our investigation into certain reports of an unusually high revision rate, we determined that revised surgical technique instructions and a surgical training program are required to more consistently achieve desired clinical results in the U.S.  We expect our U.S. hip product sales will be adversely affected while we update product labeling and implement a surgical training program for U.S. surgeons. These events may result in product liability lawsuits and other claims which, regardless of their ultimate outcome, could have a material adverse effect on our business and reputation.  These actions could also delay our planned entry into the growing hip resurfacing market in the U.S. as the Durom Cup has been integral to our plans.

Id. ¶ 110.

On October 23, 2008, Zimmer issued a press release announcing its revisions of its revenue and earnings guidance and reporting that a $47.5 million dollar fund was being established to deal with claims related to the Durom Cup. Id. ¶ 112. Following issuance of this press release, Zimmer's stock prices decreased from $51.66 to $44.69, a 13.5% drop. Id. ¶ 114.

Plaintiff charges in this litigation that the afore-referenced statements by Defendants were all inaccurate because: (1) the company's quality systems at Zimmer's Dover, Ohio facility, which manufactured Zimmer's OSPs, were seriously lacking; (2) many patients receiving the Durom Cup in hip replacement procedures disproportionately experienced cup loosening that required corrective surgery; and (3) loss provisions associated with product liability and other claims were not accurately reflected in the Company's financial statements. Compl. ¶ 116. We address the legal sufficiency of these allegations below.

## II. Legal Analysis

Defendants have filed a motion to dismiss Plaintiff's Amended Complaint. To survive Defendants' motion to dismiss, Plaintiff's allegations for breaches of fiduciary duties and ERISA violations must comply with the familiar requirements of Federal Rule of Civil Procedure 8(a)(2), which straightforwardly requires "a short and plain statement of the claim showing that the pleader is entitled to relief." This standard has been refined to require that "a complaint must contain sufficient factual matter, accepted as true, to

'state a claim to relief that is plausible on its face.'" Iqbal, 129 S.Ct. at 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. A party moving to dismiss nonetheless bears a weighty burden. "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." Twombly, 550 U.S. 544, 563 (2007) (citing Sanjuan v. Am. Bd. of Psychiatry & Neurology, Inc., 40 F.3d 247, 251 (7th Cir. 1994) ("[At the pleading stage] the plaintiff receives the benefit of imagination, so long as the hypotheses are consistent with the complaint.")). In addressing a Rule 12(b)(6) motion, we treat all well-pleaded factual allegations as true, and we construe all inferences that reasonably may be drawn from those facts in the light most favorable to the non-movant. Lee v. City of Chi., 330 F.3d 456, 459 (7th Cir. 2003); Szumny v. Am. Gen. Fin., 246 F.3d 1065, 1067 (7th Cir. 2001).

In ruling on Defendants' Motion to Dismiss, we must specifically determine whether Plaintiff has sufficiently alleged: (1) that each respective defendant was a fiduciary to the Plan; (2) that there was some breach of each respective defendant's fiduciary duty; and (3) that any such breach will support a finding that it caused harm to Plaintiff. See Howell v. Motorola, Inc., 633 F.3d 552, 562 (7th Cir. 2011).

### A.     Howell v. Motorola, Inc.

Earlier this year, the Seventh Circuit handed down its decision in Howell v. Motorola, Inc., a case with facts and legal issues very similar to those before us in the

instant litigation.[6]  Therefore, as an initial matter, we think it might be helpful to a clear

understanding of our decision in the case before us to summarize the Seventh Circuit's

findings in that case.  Following an explication of the <u>Howell</u> decision, we will address

the manner in which that holding applies to the facts at hand.  Notably, the Seventh

Circuit's decision in <u>Howell</u> was rendered at the summary judgment stage after full

discovery had been conducted, a procedural point emphasized by the Seventh Circuit in

its holding.  <u>Id.</u> at 573.  The case before us, obviously, has not proceeded to that stage,

and thus, as Plaintiff urges, the evidentiary underpinnings are distinguishable from those

applicable to the <u>Howell</u> plaintiffs.  Still, the <u>Howell</u> decision is instructive with regard to

whether liability can ever attach to the conduct that Plaintiff has alleged, regardless of

whether he is able to adduce the evidence necessary to support such a claim.

     In <u>Howell</u>, the Seventh Circuit consolidated two cases brought against Motorola

relating to losses incurred by plaintiffs, who were Motorola employees and participants in

the company's defined-contribution pension plan (the "Motorola Plan").  Motorola itself,

its Profit Sharing Committee, and a number of other alleged fiduciaries of the plan were

named as defendants.  The facts of the case arose in early 1999, when Motorola agreed to

provide financing to a Turkish company who planned to improve the infrastructure for

mobile telephone service in Turkey.  <u>Id.</u> at 555.  Over the course of the ensuing few years,

---

[6]Because the briefing of Defendants' motion was completed prior to the Seventh Circuit's decision in <u>Howell</u>, the Court allowed the parties to submit supplemental briefing regarding the effect of that decision on our analysis of this case.

the Turkish company failed to repay Motorola the $1.8 billion it had borrowed from Motorola. Id. The lawsuit brought by the Motorola plaintiffs was based on whether, or the extent to which, the company had been forthcoming about the failed business transaction in its filing with the Securities and Exchange Commission. Although the company acknowledged the financing agreement in its filings and "optimistically estimated the sales potential from the agreement" in a May 2000 Form 10-Q, it was silent about the transaction until a March 2001 proxy statement was issued in which the company, in finally acknowledging the contract, noted, but not until deep into the document, that it was owed $1.7 billion as a result of financing to "one customer in Turkey." Id. On April 6, 2001, the media "broke the story" regarding the problems with Motorola's business transaction, and the company's stock sank 23% in a single day. Id. at 556. On May 14, 2001, which date marked the end of the class period in that case, Motorola acknowledged in its Form 10-Q that, of the company's $2.9 billion in gross long-term finance receivables, approximately $2 billion was attributable to that one specific Turkish customer. Id. Motorola also disclosed that the Turkish customer had failed to make a $728 million payment that had been due on April 30, 2001. Id. The record compiled in that case revealed evidence that Motorola's Chief Financial Officer, Chief Executive Officer, and Chief Operating Officer, all of whom were named as defendants, had discussed potential problems with the financing. Id. at 555-556. However, there was apparently no evidence in the record to indicate that any other defendant had knowledge of the problems associated with that particular business

transaction.[7]  Id.

The Motorola Plan was a defined-contribution plan, meaning that participants could contribute into individual accounts up to a specified amount and then would be entitled to whatever had accumulated in that account by the time of retirement.  Id. AT 556.  This Plan was organized under ERISA section 404(c), which provides that participants – as opposed to Motorola Plan fiduciaries – are solely responsible for allocating assets among the various funds offered by the Motorola Plan.  Id.

Until July 2000, Motorola Plan participants could choose among four investment options, including the Motorola Stock Fund.  Id. at 557.  After July 2000, five other investment options were added to the portfolio.  Id.  Participants were allowed to allocate their contributions among any of these funds on a daily basis.  Id.  Importantly, "[t]he Plan's governing documents allowed, but did not require, the Plan to offer the Motorola Stock Fund as one option, and no Plan participant was ever required to invest in that fund."  Id.

As described by the Seventh Circuit, the Motorola plaintiffs sought relief based on three alleged breaches of fiduciary duty:

> (1) imprudence, by selecting and continuing to offer the Motorola Stock Fund to Plan participants despite the defendants' knowledge of Motorola's bad business transaction; (2) either negligent or intentional

---

[7]The Seventh Circuit in Howell did not reach the question of whether any other defendants had breached a fiduciary duty because the record failed to indicate that they had anything to do with "choosing the investment menu" offered under the Motorola Plan or that they had any knowledge of the problems associated with the Turkish transaction.  Id. at 568.

> misrepresentation of material information about the bad business
> transaction or failure to disclose that information to Plan participants; and
> (3) failure to appoint competent fiduciaries to the committee that ran the
> Plan, failure to monitor those fiduciaries, and failure to provide adequate
> information to the fiduciaries themselves.

Id. at 554.  The district court had granted summary judgment in favor of the defendants,

ruling that plaintiffs had failed to show that any defendant had breached a fiduciary duty

imposed by ERISA and that all defendants were protected from liability by the safe

harbor provision set out in ERISA § 404(c).  The Seventh Circuit affirmed the district

court's finding that the defendants had not breached any duty imposed by ERISA by

including Motorola stock as an investment plan option.  Further, the appellate court

concluded that the § 404(c) safe harbor protections shielded defendants from liability

related to the plaintiffs' disclosure and monitoring theories.  Id. at 569-73.

However, the Seventh Circuit ruled that the safe harbor provision did *not* operate

as a defense against the claims relating to the imprudent retention of Motorola's

securities.  Id.. at 567 ("[T]he selection of plan investment options and the decision to

continue offering a particular investment vehicle are acts to which fiduciary duties attach,

and [] the safe harbor is not available for such acts.").  In determining that § 404(c) could

not be used to defend against a claim of imprudent fund selection, the Seventh Circuit

explained:

> [t]he language used throughout section 404(c) . . . creates a safe harbor only
> with respect to decisions that the participant can make.  The choice of
> which investments will be presented in the menu that the plan sponsor
> adopts is not within the participant's power.  It is instead a core decision
> relating to the administration of the plan and the benefits that will be

offered to participants.

Id. at 567 (emphasis supplied).

Turning to the Howell plaintiffs' imprudence theory, the Seventh Circuit characterized the plaintiffs' evidence aimed to establishing that the defendants breached a fiduciary duty to be "fatally thin," in part due to a lack of any evidentiary support to show that the company was facing "imminent collapse" as a result of the failed transaction. Id. at 568-69. The court explained that this case must be analyzed against the "backdrop" of the presumption of prudence, which courts apply where plan documents direct a fiduciary to invest in the company's stock.[8] Id. (citing Summer v. State Bank & Trust Co., 453 F.3d 404, 410 (7th Cir. 2006); Moench, 62 F.3d at 571-72 (3d Cir. 1995)). Applying that standard, the Court ruled in favor of the defendants, affirming the district court's grant of summary judgment. Id. at 569. This decision provides the precedential and analytical template for our resolution of the case before us here.

---

[8]The purpose of the Moench presumption of prudence is to prevent a fiduciary from being forced to choose between violating the terms of a plan or violating the fiduciary's duty of prudence. White v. Marshall & Ilsley Corp., No. 10-cv-311, 2011 U.S. Dist. LEXIS 66226, at *11 (E.D. Wis. June 21, 2011)(citing Moench v. Robertson, 62 F.3d 553, 568-69 (3d Cir. 1995)). As recently explained by the district court sitting in the Eastern District of Wisconsin:

A plaintiff may overcome the presumption only in limited situations, by showing that a prudent fiduciary "could not have reasonably believed that the plan's drafters would have intended under the circumstances that he continue to comply with the ESOP's direction that he invest exclusively in employer securities." A plaintiff must demonstrate more than that the employer's stock did not perform well or that investment in company stock entailed a high degree of risk.

White, 2011 U.S. Dist. LEXIS 66226, at *11.

**B.    Count I: Imprudence**

Plaintiff alleges that Defendants breached their fiduciary duties to Plaintiff by failing to prudently and loyally manage the Plan's investment in Zimmer Stock as evidenced by its continuing offer of Zimmer Stock as an investment option when it was no longer prudent to do so.  Pursuant to Howell, we shall examine the record before us to determine whether Plaintiff has adequately alleged a breach of duty by any fiduciary of the Plan.  The parties devote much of their rhetorical energy to the issue of whether the Defendant fiduciaries are entitled to benefit from a presumption of prudence in light of the requirements of the Plan in this case.  Defendants argue that Howell confirms that this presumption applies to fiduciaries of an EIAP, irrespective of whether the plan requires investment in a company stock.  Plaintiff takes the opposing view, contending that fiduciaries are not entitled to an "ironclad presumption" and suggesting instead that "perhaps there is a "sliding scale" of judicial scrutiny depending on whether company stock is required or not . . . ."  We share Plaintiff's view that the Seventh Circuit did not unequivocally endorse the application of a presumption of prudence in circumstances where an EIAP does not require fiduciaries to invest in company stock, holding instead that the fiduciaries' decision to continue offering Motorola stock as an option must be evaluated against the "backdrop" of such a presumption, which courts apply when such a stock offering is directed.  Id. at 568.

Under the standards employed by the Seventh Circuit in Howell, Plaintiff must allege and be prepared to prove that each Defendant had control over the decision to

continue to offer Zimmer stock as an investment option, that each Defendant had

knowledge of the problems Plaintiff alleges that made that choice imprudent, and that

those problems rose to the level of seriousness and visibility that they should have "tipped

the Plan's fiduciaries off" to the fact that Zimmer's stock had become "so risky or

worthless" that it should have been removed as a Plan investment option.  Id. at 568-69.

Thus, even without an express endorsement by the Seventh Circuit of the application of

the presumption of prudence in instances where investment in company stock is not

mandated, Plaintiff's allegations clearly must satisfy this high standard.[9]

---

[9]Careful readers of prior decisions on these issues entered by the undersigned judge might have noted we have previously grappled with the application of the presumption of prudence in another recent case, opining there that the presumption of prudence does not apply when investment in company stock is not absolutely required.  West v. WellPoint, Inc., No. 1:08-cv-0486-SEB-TAB, 2011 U.S. Dist. LEXIS 35223, at *31 ("Although the Seventh Circuit has yet to opine on the extent to which the presumption of prudence applies where investment in company stock is not absolutely required, well reasoned decisions from other trial courts in this circuit have held that the presumption does not apply in such situations.").  We do not view our decision to be inapposite, given that the WellPoint case had no reason to delve into the exacting standard that the Seventh Circuit applied in Howell whether the presumption of prudence applies.  Our decision to grant the defendants' motion to dismiss in WellPoint was based on insufficient allegations regarding scienter as opposed to the "non-application" of the presumption.  Any potential confusion arising from that lack of explanation regarding the standard is thus inconsequential.

Our conclusion in both this case and WellPoint reflects the Seventh Circuit's hesitance to "grapple with the extent of Moench's force as to EIAPs in this circuit" in Peabody v. Davis, 636 F.3d 368, 374-75 (7th Cir. 2011), a case decided after Motorola, Inc..  In Peabody, the Court held that it did not matter whether the presumption of prudence applied because the Defendants had breached their duty of prudence by remaining heavily invested in company stock "as the company's fortunes declined precipitously over a five-year period for reasons that foretold further and continuing declines."  Id. at 375.  The Court took pains to emphasize the narrowness of its reasoning with regard to the company's decline in that case explaining, "Most business failures are not so foreseeable, and a severe decline in company stock value does not, without considerably more, create a duty to divest from company stock.  Id. at 375. n. 7.

Plaintiff's Amended Complaint alleges that, pursuant to the Company's Summary Plan Description, it was the Benefits Committee, as opposed to Zimmer, the Director Defendants, Rogers, Crines, and the Administrative Committee, that had the duty and discretion "to periodically review the Plan's investment[s] and to decide to add more investments funds or eliminate some of them, as its deems appropriate." Am. Compl. ¶¶ 34. Thus, it appears that the defendants other than the Benefits Committee would not have had the requisite authority related to investment options offered to Plan participants. Additionally, based on the allegations in the Amended Complaint, the Administrative Committee also apparently lacked any discretionary authority relating to the appointment of individuals who possessed that authority. Id. ¶¶ 37-38. Defendants, however, do not dispute the fiduciary status of each Defendant with regard to each count and thus, for present purposes only, we assume that each Defendant had some degree of control over the decision to continue to offer Zimmer stock as an investment option.[10]

Given that each of the Defendants' was a fiduciary, we turn next to examine Plaintiff's allegations concerning the level of awareness of each Defendant regarding the problems Zimmer was experiencing with its Durom Cup and OSP manufacturing. The Seventh Circuit has stated that "[a] conclusory statement that all defendants should have known specific facts about a company is generally insufficient to state a claim; it must be alleged that each defendant was in a position to know or learn of the information." Pugh

---

[10]We also assume for purposes of considering Defendant's motion that Zimmer's fiduciary status is derivative of its directors' status .

v. Tribune Co., 521 F.3d 686, 701 (7th Cir. 2008).  Plaintiff's Amended Complaint lacks

any such individualized allegations of knowledge attributable to each Defendant.

However, Plaintiff has alleged that, "despite their knowledge of the imprudence of the

investment, Defendants failed to take any meaningful steps to prevent the Plan . . . from

suffering losses as a result of the Plan's investment in Zimmer Stock."  Am. Compl. ¶

133; see also id. ¶¶ 135-137.  Despite these clear insufficiencies in Plaintiff's allegations

pertaining to each Defendants' respective knowledge of the problems with the value of

Zimmer stock such that it would have made that stock an imprudent investment option,

we will assume such knowledge on each Defendant's part for purposes of resolving the

motion before us.

     Assuming then the fiduciary role of each Defendant and each Defendant's

individual knowledge of problems related to the Durom Cup and OSPs, we turn to

address whether Plaintiff has sufficiently alleged as to each Defendant a breach of his/her

fiduciary duties; in this regard, we must determine: would the allegations support a

finding that each of these fiduciaries were or should have been tipped off to the fact that

Zimmer's stock had become "so risky or worthless" that it warranted removal of the stock

as a Plan investment option?  Defendants maintain that the declines in Zimmer's stock

price of 4%, 7%, and 13.5% are modest by any standard and thus would not in and of

themselves ever support a conclusion that the Plan should have discontinued offering

Zimmer's stock as an investment option.  Def.'s Mem. at 17; Def.'s Supp. Mem. at 4-5.

We agree with that assessment, holding that, even if true, the referenced price decreases

as alleged by Plaintiff do not, in and of themselves, support a claim that each of the Defendants breached his respective fiduciary duty of prudence by allowing the Plan to continue to offer Zimmer stock as an investment option.

As was true with the referenced stock declines in <u>Howell</u>, the stock declines alleged here by Plaintiff did not occur over the course of only a few days. Rather, Zimmer's stock dropped 4% in April 2008, following the company's announcement of its remediation efforts in the OSP division of Zimmer's facility in Dover, Ohio. Am. Compl. ¶¶ 96-100. Even Plaintiff's Amended Complaint characterized this decline as "slight." <u>Id.</u> ¶ 100. The next decline was a 7% drop in Zimmer's stock price, following issuance of the July 22, 2008 press release which announced Zimmer's suspension of marketing and distribution of its OSPs. <u>Id.</u> ¶¶ 105-09. In October 2008, when the company downwardly revised its revenue and earnings guidance and announced the arrangements it had made to deal with claims arising from failed Durom Cups, the stock price fell 13.5%. <u>Id.</u> ¶¶ 112-14. "Mere stock fluctuations, even those that trend down significantly, are insufficient to establish the requisite imprudence . . . [to establish a breach of fiduciary duty] ." <u>Howell</u>, 633 F.3d at 568-69 (quoting <u>Wright v. Oregon Metallurgical Corp.</u> 360 F.3d 1090, 1099 (9th Cir. 2004)). Thus, we hold that the stock declines as alleged by Plaintiff, even if deemed economically significant, were insufficient as the basis for a finding that the Defendants acted imprudently, given the opportunity over several months time when each of the Plan participants could have diverted his/her contributions to any of the twenty-eight other investment options described in the Summary Plan Document. <u>See</u> Summary

Plan Doc. at 11-13. As a result of Plaintiff's failure to sufficiently allege a breach of any Defendant's duty of imprudence, this claim cannot survive and must be dismissed.

### C. Count II: Failure to Disclose

Plaintiff alleges that the Defendants who communicated with the Plan's participants failed to provide them with complete and accurate information regarding the true risk associated with their investments in Zimmer Stock. Defendants respond that ERISA § 404(c)'s safe harbor bars relief for any such failure to disclose.[11] As discussed previously, Section 404(c) shields a plan's fiduciaries from liability under certain circumstances consistent with the applicable federal regulations.

As an initial matter, we note our disagreement with Plaintiff's contention (upon which he places heavy emphasis) that it would be improper for the Court to dismiss his case on the basis of Defendants' § 404(c) affirmative defense at this early stage in the litigation. The Seventh Circuit has observed that, "[a]lthough normally a district court should not base a dismissal under Rule 12(b)(6) on its assessment of an affirmative defense, that rule does not apply when a party has included in its complaint 'facts that establish an impenetrable defense to its claims.'" Hecker v. Deere & Co., 556 F.3d 575, 588 (7th Cir. 2009), *rehearing en banc denied*, 569 F.3d 708 (7th Cir. 2009)(citations omitted). Indeed, in Hecker, the Seventh Circuit affirmed a district court's decision to

---

[11] As noted in our discussion above referencing the Motorola decision, the Seventh Circuit has held that § 404(c) creates a safe harbor "only with respect to decisions that the participant can make," and is thus inapplicable to imprudence claims.

dismiss the plaintiffs' complaint based on the § 404(c) safe harbor affirmative defense. Id. at 588-89 ("The district court concluded that the Complaint so thoroughly anticipated the safe-harbor defense that it could reach that issue; we agree with it, bearing in mind that we must still consider any factual allegations in the light most favorable to plaintiffs."). The Amended Complaint before us for review itself anticipates the § 404(c) affirmative defense by specifically alleging that Defendants did not comply with the requirements of the safe harbor due to their failure to ensure participant control through complete and accurate material information. Am. Compl. ¶ 191. As the Court noted in Hecker, Plaintiff has "chose[n] to anticipate [the § 404(c)] defense in [his] Complaint explicitly and thus put it in play." Hecker, 556 F.3d at 588. That is clear by the case here as well.

The Seventh Circuit summarized the requirements of the § 404(c) safe harbor and the federal regulations implementing it, as follows:

> First, the participant must have the right to exercise independent control over the assets in [his/her] account and in fact exercise such control. Next, the participant must be able to choose 'from a broad range of investment alternatives,' 29 C.F.R. § 2550.404c-1(b)(1)(ii). As we noted in Jenkins v. Yager, 444 F.3d 916 (7th Cir. 2006), 'prominent among [the conditions a plan must meet] is that it must provide at least three investment options and it must permit the participants to give instructions to the plan with respect to those options at least once every three months. 29 C.F.R. § 2550.404c-1(b)(2)(i)(C).' 444 F.3d at 923. Third, the participant must be given or have the opportunity to obtain 'sufficient information to make informed decisions with regard to investment alternatives available under the plan.' 29 C.F.R. § 2550.404c-1(b)(2)(i)(B). The regulation sets forth nine criteria that must be met before the participant may be considered to have sufficient investment information. Id. Those criteria call for such things as clear labeling of the plan as (sic) § 1104(c) instrument, a description of the

investment alternatives available, identification of designated investment managers, explanation of how to give investment instructions, a description of 'any transaction fees and expenses which affect the participant's . . . balance in connection with purchases or sales of interests,' id. § 2550.404c-1(b)(2)(i)(B)(1)(v), relevant names and addresses of plan fiduciaries, special rules for employer securities, special rules for investment alternatives subject to the Securities Act of 1933, and materials related to voting, tender, or other rights incidental to the holdings in the account. Other parts of the regulation emphasize that the fiduciary must furnish extensive information on the operating expenses of the investment alternatives, copies of relevant financial information, and other similar materials. Id. § 2550.404c-1(b)(2)(i)(B)(2).

The regulation does not require plans to offer only cost-free investment vehicles. It recognizes that a plan 'does not fail to provide an opportunity for a participant or beneficiary to exercise control over his individual account merely because it . . . imposes charges for reasonable expenses.' Id. § 2550.404c-1(b)(2)(ii)(A). Procedures must be in place, however, to inform participants of the actual expenses incurred with respect to their individual accounts. Id. Other parts of the regulation address the required frequency of investment instructions. Finally (for our purposes), the regulation provides that independent control will not be found if a plan fiduciary has concealed material non-public facts regarding the investment from the participant or beneficiary. Id. § 2550.404c-1(c)(2)(ii).

The regulation sums up the effect of a finding of independent exercise of control, from the perspective of a plan fiduciary, as follows:

If a participant or beneficiary of an ERISA section 404(c) plan exercises independent control over assets in his individual account in the manner described in paragraph (c), then no other person who is a fiduciary with respect to such plan shall be liable for any loss, or with respect to any breach of part 4 of title I of the Act, that is the direct and necessary result of that participant's or beneficiary's exercise of control.

Id. § 2550.404c-1(d)(2)(i). The safe harbor provided by § 1104(c) is an affirmative defense to a claim for breach of fiduciary duty under ERISA. In re Unisys Sav. Plan Litig., 74 F.3d 420, 446 (3d Cir. 1996).

Hecker, 556 F.3d at 587-88.

The only § 404(c) compliance requirement that Plaintiff maintains the Plan failed to meet and about which Defendants failed to inform Plan participants was the extent to which their investments in the Zimmer Stock Fund could be impacted by the company's difficulties with its OSPs and the Durom Cup. Given the limited nature of Plaintiff's theory of recovery, we decline to address all the ways in which the Plan did apparently satisfy the requirements in the regulations. It is important to note, however, that the Summary Plan Document made available to Plaintiff and other participants expressly represented that the Plan was intended to satisfy the requirements of § 404(c) of ERISA and that the Plan's fiduciaries accordingly were "relieved of liability for any losses resulting from investment decisions made by participants and beneficiaries." Summary Plan Doc. at 17. The Summary Plan Document included a list of twenty-eight investment options being offered to participants as well as providing an opportunity by participants to change investment options "in multiples of 1% at any time" by simply contacting Fidelity to do so. Id. at 11-17. The Summary Plan Document also provided substantial information regarding the various risks relating to investment in the Zimmer Stock Fund. Id. at 14-16.

Plaintiff briefly responds by noting that he has alleged in his complaint that the Plan participants were provided incomplete information and, thus, the Plan did not meet the disclosure requirements delineated in 29 C.F.R. § 2550.404c-1(b)(2)(i)(B), thereby rendering the safe harbor protections unavailable to Defendants. Pl.'s Supp. Resp. at 10-11. Because Plaintiff and the other Plan participants had the opportunity to exercise

44

"independent control in fact" over their investments, say Defendants, and that the Summary Plan Description complies with the disclosure requirements of 29 C.F.R. § 2550.404c-1(b)(2)(i)(B)(1)(i)-(ix), described above. Plaintiff's argument in this context remains largely undeveloped, but we assume that the incomplete information referenced by Plaintiff incorporates his allegations regarding the financial implications of Zimmer's production problems with its OSPs and the Durom Cup, as previously discussed.

The Seventh Circuit has addressed in <u>Howell</u> the complete and accurate information requirement set out in the regulations as it relates to a failure to disclose claim. The plaintiffs in <u>Howell</u> maintained that the defendants' failure to disclose material information regarding the Turkish company's default –

> caused the Plan to fail to meet two requirements that the defendants must satisfy in order to take advantage of the section 404(c) safe harbor: first, it deprived participants of sufficient information to make informed decisions, because it did not provide an adequate description of the investment objectives and risk/return characteristics of the Motorola Stock Fund, <u>see</u> 29 C.F.R. § 2550.404c-1(b)(2)(i)(B); and second, it deprived them of the opportunity to exercise individual control of their accounts because the Plan fiduciaries concealed material, non-public facts related to the Motorola Stock Fund, <u>see</u> <u>id.</u> § 2550.404c-1(c)(2)(ii).

<u>Howell</u>, 633 F.3d at 569. With regard to the requirement that participants be provided sufficient information, the Seventh Circuit held that the plan documents which explained that the Motorola Stock Fund was a high-risk option, intended for long-term growth and subject to substantial short-term fluctuations, and acknowledged year by year returns varying from 9.3% to 142.2% clearly satisfied the requirement of "a general description of the investment objectives and risk" as required by the regulations at that time. <u>Id.</u>

Regarding a participant's ability to exercise the necessary control of assets, which is lacking when a plan fiduciary has concealed material, non-public facts regarding the investment, the Court ruled that plaintiffs had not introduced sufficient evidence to establish the existence of an intentionally misleading statement such as would violate the general fiduciary duty of disclosure imposed by ERISA § 404(a)(1). Id. at 571-72. The Court further explained that any omissions occurring in that case were not violative of ERISA; indeed, it said to require disclosure of such information might create insider trading liability.[12]

It is clear that, like the Motorola Plan, the Plan documents in our case provided sufficient information with regard to the investment objectives and risk associated with investing in the Zimmer Stock Fund. As referenced above, the Summary Plan Document contained an entire section entitled "Additional Information about the Zimmer Holdings, Inc. Stock Fund" in which the non-diversified nature of the fund was explained along

_____

[12]The Seventh Circuit elaborated on the potential problem of imposing liability for such non-disclosures by excerpting the following language from one of its prior decisions, Rogers v. Baxter Int'l, Inc.:

> Perhaps the defendants in this litigation did have inside information, but could they use it for plaintiffs' benefit? Plaintiffs' position seems to be that [plan fiduciaries] are obligated to adopt a policy under which employees invest in a stock during periods of good news for the issuer but not during periods of bad news. The implication is that someone else (which is to say, investors at large) must bear the loss when bad news is announced, because the [plan participants] will have bailed out. Corporate insiders cannot trade on their own behalf using private information, good or bad.

Id. at 572 (quoting Rogers, 521 F.3d 702, 706 (7th Cir. 2008)).

with the caveat that "the principal of the fund [was] not guaranteed and would normally fluctuate more than that of a diversified fund." Summary Plan Doc. at 14. The Plan further provided that a person wishing to invest in the Zimmer Stock Fund would typically be someone who "want[ed] to own part of the company [he worked] for and share in the gains and losses of its stock" and "whose investment portfolio [could] withstand the higher risk of investment in a single stock." Id. at 15. Finally, the Summary Plan Document provided a table showing the per share high, low, and closing sale prices of Zimmer stock over various time periods. Id. Thus, as was true for the appellate court in Howell, "it is hard for us [as well] to imagine what else the Plan fiduciaries could have told the participants that would have provided better guidance" regarding the risks associated with choosing to invest in the Zimmer Stock Fund. Howell, 633 F. 3d at 570.

Turning to the issue of whether participants in the Plan exercised "independent control in fact," which is a condition of eligibility for the § 404(c) safe harbor protections, we look to see if Plaintiff has alleged that Defendants "concealed material non-public facts regarding the investment." As the Seventh Circuit explained in Howell:

> [t]he regulations governing section 404(c)'s safe harbor do not define what constitutes concealment of material information, and so the district court drew upon the more general disclosure duty embodied in ERISA. Under the statute, "material facts affecting the interests of plan participants or beneficiaries must be disclosed." The district court's approach—defining the prohibition on concealment of material information contained in the regulations based on ERISA's general fiduciary disclosure obligation—is sound. While the district court is correct that this may well mean there will be no case where a defendant can both breach ERISA's fiduciary duty to

47

disclose information and also take advantage of section 404(c)'s safe harbor, we can think of no other principled way to conceptualize the disclosure obligation embodied in the regulations; nor, for that matter, do we see why the disclosure required of Plan fiduciaries under ERISA generally should be different than that required in order for fiduciaries to take advantage of section 404(c).

A violation of ERISA's disclosure requirement, which arises under the general fiduciary duties imposed by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), requires evidence of either an intentionally misleading statement, or a material omission where the fiduciary's silence can be construed as misleading. . . .  Contrary to the plaintiffs' position (and to the position of other circuits, e.g., Pfahler v. National Latex Prods. Co., 517 F.3d 816, 830 (6th Cir. 2007); Mathews v. Chevron Corp., 362 F.3d 1172, 1183 (9th Cir. 2004)), this court has required some deliberate misstatement before it finds a violation of the ERISA duty to disclose material information.  "But this does not mean that the duty to convey complete and accurate information is toothless. . . . [A]lthough negligent misrepresentations are not themselves actionable, the failure to take reasonable steps to head off such misrepresentations can be actionable."  A plaintiff may introduce evidence that a fiduciary breached the duty to disclose by committing some material omission that is misleading and actionable under the statute.

Howell, 633 F.3d at 571-72 (internal citations omitted).  At this early stage in the litigation before us, Plaintiff has no obligation to introduce evidence of the type of "intentionally misleading statement, or a material omission where the fiduciary's silence can be construed as misleading" that would bar Defendants' ability to utilize the § 404(c) safe harbor.  Nonetheless, the allegations in Plaintiff's Amended Complaint must at least potentially support such a claim.  For the reasons described below, we find them lacking.

Plaintiff's Amended Complaint lacks any allegations to establish any knowledge by any individual Defendant that any statement made was false – let alone allegations that could establish that any deliberate misstatements were actually made.  Furthermore, we

find the alleged non-disclosures regarding Zimmer's OSPs and its Durom Cup closely analogous to the information that the defendants in <u>Howell</u> failed to disclose regarding the Turkish company's default. As the <u>Howell</u> court stated, "There is no support for the view that Plan fiduciaries were required to provide all information about . . . business decisions in real time to Plan participants." <u>Howell</u>, 633 F. 3d at 572; <u>see also</u> <u>White</u>, 2011 U.S. Dist. LEXIS 66226, at *36-41 (holding that "Plan fiduciaries do not have a clear affirmative duty to inform plan participants about nonpublic corporate developments that might affect the value of employer stock."). While Zimmer's issues with the quality of its OSPs and the Durom Cup may have been the result of some bad business decisions, the issues do not rise to the level such that an omission of such information to Plan participants constitutes a violation of ERISA.

Because we agree with Defendants that the Summary Plan Document established compliance with § 404(c)'s requirements, and because we find no merit to Plaintiff's contention that Plan participants did not exercise independent control over their investments, we conclude that the ERISA § 404(c) safe harbor applies here and serves as a bar to Plaintiff's failure to disclose claim against Defendants. Dismissal is therefore required.

### D. Count III: Failure to Monitor

ERISA § 404(a) requires fiduciaries who have the power to appoint and remove fiduciaries to monitor the performance of those appointees and to provide them with any adverse information that the fiduciaries might possess. Plaintiff maintains that Zimmer

and the Director Defendants, which is to say, the "Monitoring Defendants," breached this duty by failing to inform their appointees of the substantial risks posed to Zimmer stock and/or by removing any appointees who ignored those risks. Pl.'s Resp. at 30-31. We have held, however, that Defendants are entitled to take advantage of § 404(c)'s safe harbor with regard to Plaintiff's failure to monitor claim and thus, for the same reasons previously explicated with regard to the failure to disclose claim, Defendants are shielded from liability by operation of law pursuant to § 404(c). Plaintiff's failure to monitor claim thus requires dismissal.

### E. Counts IV, V, and VI: Claims Alleging Conflict of Interest, Co-Fiduciary and Zimmer's Liability

The parties devote scant attention to Plaintiff's final three claims, namely, that Defendants breached their duties to avoid conflicts of interest, that co-fiduciary liability provides a basis for relief, and that Zimmer itself faces liability. The gravamen of Plaintiff's conflict of interest claim is that Defendants gave priority to their interests as directors and senior officers of Zimmer over the fiduciary duties owed to the Plan and its Participants, leading Defendants to "fail to disclose adverse information from the Plan's participants" and "to refrain from divesting the Plans of Zimmer Stock or ceasing new purchases." Pl.'s Supp. Resp. at 13. This and the other claims here are derivative claims based on theories of relief we have previously found unavailing. For those same reasons, these derivative claims fail as well.

### III. Conclusion

50

For the reasons detailed herein, Defendants' Motion to Dismiss is <u>GRANTED</u>.

Dismissal is, however, <u>WITHOUT PREJUDICE</u>.  Final judgment shall enter accordingly.

IT IS SO ORDERED.


Date:____12/23/2011_____

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Matthew Thomas Albaugh
BAKER & DANIELS - Indianapolis
matthew.albaugh@bakerd.com

Troy S. Brown
MORGAN LEWIS & BOCKIUS LLP
tsbrown@morganlewis.com

Troy S Brown phv
Morgan Lewis & Bockius LLP - Phi/PA
1701 Market Street
Philadelphia, PA 19103-2921

Scott D. Gilchrist
COHEN & MALAD LLP
sgilchrist@cohenandmalad.com

Irwin B. Levin
COHEN & MALAD LLP
ilevin@cohenandmalad.com

Thomas J Mckenna phv
Gainey & McKenna
295 Madison Avenue 4th Floor
New York, NY 10017

Brian T. Ortelere
MORGAN LEWIS & BOCKIUS LLP
bortelere@morganlewis.com

Marc J. Sonnenfeld
MORGAN LEWIS & BOCKIUS LLP
msonnenfeld@morganlewis.com

Marc J Sonnenfeld phv
Morgan Lewis & Bockius LLP - Phi/PA
1701 Market Street
Philadelphia, PA 19103-2921

Simon J. Torres
MORGAN, LEWIS & BOCKIUS LLP
storres@morganlewis.com

Christopher Aa Weals
MORGAN LEWIS & BOCKIUS, LLP - Was/DC
cweals@morganlewis.com

Paul A. Wolfla
BAKER & DANIELS - Indianapolis
paul.wolfla@bakerd.com